**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MORTON GROVE POST #134 OF THE AMERICAN LEGION, an Illinois Not-for-Profit Corporation,** ) ) ) ) | |
| **Plaintiff,** ) ) | **21 CV 00910** |
| **v.** ) ) | ) **Honorable John F. Kness** |
| **VILLAGE OF MORTON GROVE, ILLINOIS, a home rule Municipal Corporation,** ) ) | **Judge Presiding** |
| ) | **JURY TRIAL DEMANDED** |
| **Defendant.** ) | |

<u>**AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**</u>

**COMES NOW** before this Honorable Court the Plaintiff, **MORTON GROVE POST #134 OF THE AMERICAN LEGION**, by and through KNABE & BEDELL, and LAW FIRM OF DAVID G. SIGALE, P.C., its attorneys, and complains of the Defendant, VILLAGE OF MORTON GROVE, ILLINOIS, a home rule Municipal Corporation, as follows[1]:

**THE PARTIES**

1.       The Morton Grove Post #134 of the American Legion ("Post 134") is an Illinois Not-for-Profit corporation located in the Village of Morton Grove, Illinois.

2.       The Village of Morton Grove, Illinois is a body politic organized as a municipal corporation under the laws of the State of Illinois ("the Village").  Pursuant to Article 7 of the 1970 Constitution of the State of Illinois, the Village is a "home rule" municipality.

---

[1] In accordance with the Court's Standing Orders, a red-lined version of the Amended Complaint is attached hereto as Exhibit 6.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.  This Court also has supplemental jurisdiction

over claims alleged under state law pursuant to 28 U.S.C.§1367 as the state law claims are so

related to claims in the action within the Court's original jurisdiction that they form part of the

same case or controversy.

4.      Venue lies in this Court pursuant to 28 U.S.C. § 1391 because the events and

omissions giving rise to this action are harming Plaintiffs in this District.

## STATEMENT OF FACTS

5.      Post 134 was organized in 1946 and has continuously served veterans, and the

community, since it was established.  There are currently over 1,000 members of Post 134, both

men and women, who served in the various branches of the United States Military and who have

served in conflicts dating back to World War II.

6.      As an organization, and as described on its website www.legion.org/mission;

> The American Legion was chartered and incorporated by Congress in
> 1919 as a patriotic veterans organization devoted to mutual helpfulness. It
> is the nation's largest wartime veterans service organization, committed to
> mentoring youth and sponsorship of wholesome programs in our
> communities, advocating patriotism and honor, promoting strong national
> security, and continued devotion to our fellow service members and
> veterans.

7.      Since its inception, Post 134 has fulfilled this mission in the Village of Morton

Grove through numerous events and community projects, such as participating in Memorial Day

and Veterans Day parades, providing a Color Guard for the 4th of July Parades, performing

regular visits to both Jesse Brown and Hines VA hospitals, assisting veterans in need, presenting

the Gift to The Yanks Holiday program for veterans in nursing homes and VA hospitals, and providing various programs for the youth of Morton Grove, Illinois.

8.       In September, 1949, Post 134 constructed a Post building at 6140 Dempster Street, Morton Grove, Illinois (hereinafter the "Building").  The Building served as a memorial to those who have served the United States in the armed forces, as well as a place to provide services to residents of the Village with functions such as the Fourth of July celebrations, Memorial Day celebrations, a gun range, and other functions and services.

9.       In or around the year 2000, Post 134 determined that it would be in the best interest of the Post, as well as the Village residents who the Building served, if the Village purchased the Building.  After negotiating terms that would serve the long-term interest of Post 134 as well as provide the Village with a facility adequate to its needs, Post 134 and the Village entered into an "Agreement" on February 22, 2000.  A copy of the Agreement is attached hereto as Exhibit 1 and by this reference it is incorporated herein.

10.       Pursuant to the Agreement, Post 134 conveyed title to the Building to the Village but reserved for Post 134 "so as to continue to provide certain functions and services" . . . "the license to conduct certain of its functions and to grant exclusive use of the premises on a permanent basis, subject only to the restrictions, reservations, and conditions contained in [the] Agreement."  Agreement, p.1-2.

11.       The basement of the Building included a six-lane gun range (the "Range") that provided members of Post 134's gun club a proper facility in which they could practice and maintain the skills they mastered in the military; members have included veterans who hold the Distinguished Pistol Badge, are members of the coveted and prestigious" President's 100," are

State Champions, or hold other important awards. The Range further provided to gun club members the opportunity to train for competitions as well as enjoy the camaraderie shooting sports provide. In addition, under the guidance of the best trained and safest marksmen in the world – United States Servicemen - the Range also served the surrounding youth community by providing a facility at which Boy Scouts could earn their Rifle Merit Badge; and, under the tutelage of Post 134 members, the Range was used to train girls and boys ages 12-20 for a winter shooting league for junior shooters.

12.     When the Post 134 sold the Building to the Village, it was a material term of the Agreement that Post 134 have the right to continue operation of the Range.  In describing areas of use (either "exclusive" or "non-exclusive") that Post 134 retained, the Agreement specifically provided, in paragraph 4(b):

> The entire lower level basement, which includes the gun range and related storage and work rooms for the Legion's exclusive use. …The hours of operation of the gun range will be controlled by the Legion.  The Village will continue to license the gun club so long as the Legion continues to operate the gun club and provided that the Legion operate and maintain the gun range in compliance with all applicable local, state and federal rules, regulations and laws.

13.     In or around April, 2012, an inspector from the Intergovernmental Risk Management Agency ("IRMA"), the Village's insurer, inspected the Range and concluded that the ventilation system was not adequate or in compliance with industry standards.  The inspector ordered the Range closed, at which point the Village padlocked the door to the range and posted a sign that prohibited anyone from entering the Range room without approval of the Village Chief of Police.

14.    Members of Post 134 subsequently met with representatives of the Village in an effort to identify what work and upgrades would be necessary to re-open the Range. Meetings between Post 134 and Village officials continued over the following months and then years. During the entire time that followed, the Village was aware of Post 134's desire to perform the necessary upgrades, as well as Post 134's efforts to bring the Range into compliance with appropriate standards, and the Village stated on more than one occasion that it "DOES NOT oppose the operation of the [R]ange" (emphasis in original) and that it "continues to look forward to working with [Post 134] in order to reach the mutual attainment of our collective goals for facility functionality and public safety."  Letter, dated June 1, 2012, to Post 134 from Village Administrator Ryan J. Horne; Letter, dated November 14, 2012, to Post 134 from Village Fire Chief Thomas Friel. Despite these pronouncements of support, the Village's later conduct, detailed below, belied their friendly rhetoric.

15.    A number of Post 134 members, some of whom had experience in construction and the heating, ventilation and air conditioning ("HVAC") fields, attempted to upgrade the Range's ventilation system so as to satisfy the concerns of the Village and IRMA. The Village, however, required the volunteers to stop as Post 134 had not obtained proper permitting for work. In response, Post 134 submitted a proposal to the Village in March, 2013. Once again, the Village and Post 134 met and discussed the proposed and required work.  Ultimately, the Village found the proposal insufficient based on a July 31, 2013, report from the Village's range consultant Patriot Range Technologies ("Patriot") .

16.     Under the coordination of a licensed architect that Post 134 retained and paid, on or about January 19, 2016, Post 134 submitted an application for a building permit that included the architect's drawings and HVAC proposals from an HVAC contractor.

17.     By letter dated May 5, 2016, to Post 134 from Village Fire Chief Thomas Friel, the Village declined to issue a building permit, relying on reports from several consultants, including a *new* report from Patriot.   The Village concluded its letter, stating: "Once you and your architect, and other project associates have reviewed these documents, I would welcome the opportunity to meet with your team along with representatives from Village staff and Patriot Range Technologies to discuss how this project can be advanced."

18.     Post 134 then assembled a professional team that included, in addition to the previously retained architect, a licensed mechanical engineer, and made what it believed were the required changes and corrections to its plans and resubmitted them to the Village on March, 2018.  The Village made additional criticisms of Post 134's new submission on September 4, 2018.

19.     In order to address the Village's new and additional criticisms, Post 134 retained an additional expert, one in the field of construction of shooting ranges, to assist it in preparing a comprehensive plan to support an application for a building permit.

20.      Post 134's team of consultants reviewed the prior reports and comments of the Village's experts in their respective fields.  Working together, Post 134's consultants prepared another application for a permit to perform work that would bring the Range within industry standard and in conformity with applicable building and safety codes. Post 134's licensed

architect submitted the application, with detailed drawings, HVAC specifications, and range

safety modifications, to the Village on November 25, 2019.

21.     Hearing no response from the Village by the end of January, 2020, on February 5,

2020, the architect contacted the Village Building Department to inquire about the status of

permit review. At that time, the Village advised the architect that the permit under which the

application was submitted had expired. The very next day, however, the architect received an e-

mail indicating the Village was conducting an internal review of Post 134's application and

technical submissions but requested a digital copy of the plans and application.  The architect

complied with this request straightaway, sending .pdf versions on February 13, 2020.

22.     In the ensuing months, Post 134 heard little from the Village, except e-mails from

the Village's Permit Administrator, who said Post 134's application and supporting documents

were being reviewed, but that the Village had to coordinate with their outside consultants and the

like.

23.     Then, on or about August 3, 2020, Post 134 received a letter from the Village

denying its application. The Village first indicated that, because the Range had not been used for

six consecutive months, its use was now a "non-conforming" use under the Village's zoning

ordinance, requiring Post 134 to obtain a special use permit. The Village further indicated that it

and its consultants found Post 134's plan "does not comply with applicable code requirements

and industry standards." In addition, for the first time in this entire process, the Village made a

demand for the cost of permit review not only going forward (this request made despite the

earlier statement on non-conforming use) but for reimbursement of consultant fees the Village

previously paid.

24.     The bases upon which the Village concluded that Post 134's plan "does not comply with applicable code requirements and industry standards" were not justified by law or industry standard but were unreasonably imposed.

## COUNT I: VIOLATION OF RIGHT TO KEEP AND BEAR ARMS
## U.S. CONST. AMENDS. II AND XIV, 42 U.S.C. § 1983

25.     Paragraphs 1 through 24 are incorporated as though fully stated herein.

26.     The Second Amendment, which applies against the Village by operation of the Fourteenth Amendment, secures the right to operate firearms at a range, for purposes of learning about firearms, gaining proficiency with firearms, obtaining any training required as a condition of firearms ownership, recreation, and competition; and the right to own and operate a range for these purposes.

27.     After shuttering the Range in 2012 based on alleged ventilation issues, the Village has at every turn met Post 134's effort to come into compliance with new and unreasonable or unnecessary requirements; with each of Post 134's submissions, the Village added a new "consultant" and a new layer of demands.  Moreover, the demands were not justified  under federal, state, or local law, or industry guidelines but were pretexts employed to endlessly drag on the permit process and impose additional costs on this not-for-profit veterans group all with the ultimate goal that the Range never open again. Examples of the Village's unreasonable and unsupportable demands include:

a.      Most egregious is the Village's insistence that the Range comply with Occupational Safety and Health Administration ("OSHA") standards for lead exposure. The Village's demand is unreasonable and unsupportable because the Range **has no employees** and OSHA standards only apply to indoor shooting range with employees;

8

b.       Even if OSHA standards applied, OSHA **does not mandate** any particular ventilation requirements but, rather, sets limits for exposure to work place lead that, if exceeded, must be remediated; the Village's demand for a specific ventilation system with any particular features is not justified by federal, state, or local law.

c.       The Village switched in 2018 from Patriot to Carey Small Arms Range Ventilation ("Carey") to advise it on ventilation specifications the Village would impose on the Range. Under Carey's report, the Village **now** insisted that the Range install a system capable of a downrange airflow of 75 feet per minute ("fpm").  However, in the event a ventilation system is used to mediate lead exposure, the industry standard **and the standard set forth by IRMA and the 2013 Patriot report** accepted a minimum air flow of **50** fpm, which the proposed Range ventilation system met; the Village's rejection of Post 134's permit application on Carey's higher requirement was not based in law, industry standard, or the requirements of the Village's insurer;

d.       While both the Patriot reports and the report of Meggit Training Systems (the *new* consultant the Village hired for non-ventilation range specifications), acknowledged that the bullet trap (the down range plate at which shots are directed) that is currently installed in the Range functions properly, the Meggit report, on which the Village relied to reject Post 134's 2019 permit request, still called for its replacement;

e.       Patriot's 2013 report, on which the Village relied in finding the Range non-compliant, demanded extraneous conditions, such as requiring Post 134 to install a hand-washing sink immediately outside the Range entrance, install a separate eye washing station, and provide a separate room "adjacent to the washing facilities" for a "weapons cleaning area."  Not only were these Village requirements not required for the Range by any law or industry standard, these demands *disappeared* from later Patriot report and were never raised in the Meggit report.

9

f.    The replacement of Patriot with Carey and Meggit, with the accompanied increase in unsupportable demands for changes to Post 134's permit application, was one of several switches in the individuals and entities the Village relied on to formulate ever more conditions for the issuance of a permit.  In addition to the shifting sands created by changing the shooting range consultants, Post 134 is informed and believes that the Village employed an outside/third-party permit review firm to evaluate Post 134's permit application starting in 2018. With this change the Village raised for the first time in a process that had been on-going for nearly six years things like: "door and hardware" compliance; "missing room names/titles to spaces;" "door closure compliance;" and "a signed and dated COMcheck lighting compliance report."  While not individually onerous, these new requests were indicative of the ever moving goal posts that Post 134 had to achieve with each of its submissions.

g.    Post 134 submitted its revised plans, addressing the Village's March 26, 2018, comments and demands, on November 11, 2019. Hearing no response from the Village *for three months,* Post 134's architect called the Village on February 5, 2020, to inquire as to the status of the application; *only then* did the Village notify Post 134 that it's prior application had expired and that the November 11, 2019 submission would have to be ***re-submitted*** under a new application.  Post 134 did so on February 13, 2020.

28.    The Village's August 3, 2020, rejection of Post 134's "February 13, 2020" permit application, which included "updated" reports from Carey and Meggit, ignored virtually all of the changes Post 134's professional team made in response to Village's demands in its September 4, 2018 rejection of Post 134's  March 26, 2018 permit application.  In an October 8, 2018, and later November 4, 2019, Memorandum from Lehman Design Consultants, Inc., Post 134's licensed mechanical engineering consultant, and an October 11, 2019 letter from

Northlight Architects, Post 134's architect and lead consultant for the permit application process, Post 134 addressed, ***point by point,*** each of the Village's comments, explaining the corrective action taken or the reason these professionals deemed them unnecessary. Copies of Post 134's above mentioned responses, as well as Village's August 3, 2020 rejection, are attached as Exhibits 2, 3, 4, and 5 respectively.

29.     Instead of openly and honestly reviewing and responding to each of the points in Post 134's permit application, Carey and Meggit merely took their 2018 reports and added "redlined" notes where they believed "minimal" changes were made. In fact Post 134's last permit application contained significant changes. Of particular note, however, was one "redline" in Carey's report that admitted its "design standard ***prefers*** an air flow velocity of 75 feet per minute average." Even here it could not say that "federal, state, or local law" *requires* this performance standard; it could not because it cannot under the applicable law. Still the 75 fpm standard was a significant basis on which the Village rejected Post 134's permit application.

30.     The Village was also aware that, since *the Village forced Post 134 to stop using the Range* for its intended purpose, Post 134 *never* abandoned the Range but was continuously working to bring the Range into compliance with applicable law; any time Post 134 stopped work it was at the Village's insistence. Because Post 134 never abandoned the Range, but was in the process of renovation and improvement, the Village's assertion that the Range is a non-conforming use is factually and legally incorrect and an additional improper hurdle that has erected against Post 134 and its Range.

31.     The Village's pattern and practice of intentionally and wrongfully preventing Post 134's ability to re-open the Range unduly burdens the Second Amendment right to operate the Range and its members' ability to exercise their Second Amendment right to use the Range.

11

Under color of law, the Village thus deprives Post 134 and its members of their right to keep and bear arms, in violation of the Second and Fourteenth Amendments to the United States Constitution. Post 134 is thus damaged in violation of 42 U.S.C. § 1983 and is therefore entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Village's unconstitutional customs, policies, and practices.

## COUNT II: VIOLATION OF FREE SPEECH
### U.S. CONST. AMENDS. I AND XIV, 42 U.S.C. § 1983

32.     Paragraphs 1 through 31 are incorporated as though fully stated herein.

33.     The First Amendment, which applies against the Village by operation of the Fourteenth Amendment, secures the right to provide and receive education and instruction in the use of firearms, including the right to provide and receive the training required by defendant as a prerequisite to owning firearms.

34.     By so burdening the owning and operation of the Range, the Village, currently under color of law, deprives Post 134 and its members of their right to free speech, in violation of the First and Fourteenth Amendments to the United States Constitution. Post 134 is thus damaged in violation of 42 U.S.C. § 1983 and is therefore entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the Village's unconstitutional customs, policies, and practices.

## COUNT III: VIOLATION OF ILLINOIS STATE LAW
### BREACH OF LEASE AGREEMENT

35.     Paragraphs 1 through 31 are incorporated as though fully stated herein.

36.     The Agreement created enforceable contractual obligations between the Village and Post 134, one of which was Post 134's right to operate the Range.

37.     By unreasonably, and without justification by law or industry standard, preventing Post 134 from enjoying the benefit of the Agreement, the Village is in breach of the Agreement.

378     Post 134 has made repeated demands of the Village to cease and cure its breach, but the Village has so far refused.

39.     Post 134 has been damaged by the Village's breach of the Agreement.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, MORTON GROVE POST #134 OF THE AMERICAN LEGION, respectfully requests this Honorable Court enter judgment in its favor and against the Defendant, VILLAGE OF MORTON GROVE, ILLINOIS, a home rule Municipal Corporation, and to grant Plaintiff the following relief:

1.     Enter an order preliminarily and permanently enjoining the Village, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from preventing Post 134 from completing the renovation and improvement of the Range as proposed in the application for building permit, with its accompanying plans, submitted to the Village on February 13, 2020, including the mandatory relief requiring the Village to issue the necessary and appropriate permits for these renovations and improvement;

2.     Enter an order preliminarily and permanently enjoining the Village, its officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from preventing Post 134 and its members from operating and using the Range, including mandatory relief that the Village issue the necessary permits and licenses necessary to the operation of the Range;

3.     Grant Plaintiff any and all further declaratory relief consistent with the injunction;

4.     Award Plaintiff money damages, in an amount to be proven at trial, for the Village's breach of the Agreement;

5.     Award Plaintiff attorney fees and costs, pursuant to 42 U.S.C. § 1988;

6.     Award Plaintiff costs of suit; and

7.    Grant Plaintiff such other and further relief as this Honorable Court deems just and appropriate.

**POST 134 DEMANDS TRIAL BY JURY.**


Dated: May 13, 2021

**MORTON GROVE POST #134 OF THE AMERICAN LEGION**

By: ___/s/ Gregory A. Bedell_____
      One of its Attorneys



Gregory A. Bedell, (#6189762)          David G. Sigale (Atty. ID# 6238103)
KNABE & BEDELL                          LAW FIRM OF DAVID G. SIGALE, P.C.
33 North Dearborn Street                430 West Roosevelt Road
10th Floor                              Wheaton, IL 60137
Chicago, IL 60602                       630.452.4547
312.977.9119                            dsigale@sigalelaw.com
gbedell@kkbchicago.com

Attorneys for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on May 13, 2021, he electronically filed the foregoing document with the Clerk of the Court for the Northern District of Illinois by using the CM/ECF system. All participants in the case are registered CM/ECF users who will be served by the CM/ECF system.

<u>/s/ Gregory A. Bedell</u>